(C. D. 1441)

Esso Standard Oil Co. *v.* United States

United States Customs Court, First Division

(Decided July 7, 1952)

*Sharretts, Hillis & Paley* (*Howard C. Carter* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*John J. McDermott* and *Richard E. FitzGibbon*, special attorneys), for the defendant.
*Lamb & Lerch* (*John G. Lerch* of counsel) as *amici curiae*.
*Eugene R. Pickrell* (*Theodore A. TeGrotenhuis* and *Eugene R. Pickrell* of counsel) as *amicus curiae*.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Merchandise described on the invoice as "Synthetic Stylene," and known in the trade as "S-Polymer" (the designation hereinafter used), was classified by the collector under paragraph 28 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 28), and assessed with duty at 45 per centum ad valorem and 7 cents per pound. In support of the official action, defendant relies on the part of said paragraph reading:

PAR. 28. Coal-tar products:

\* \* \*; synthetic phenolic resin and all resin-like products, prepared from phenol, cresol, phthalic anhydride, coumarone, indene, or from any other article or material provided for in paragraph 27 or 1651, all these products whether in a solid, semisolid, or liquid condition; \* \* \* all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651; \* \* \* .

The Government contends, first, that the merchandise in question was prepared in part from benzene, one of the products mentioned in

paragraph 1651 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1651), and alternatively claims that the S-Polymer before the court was prepared in part from styrene, a product occurring naturally in coal tar and provided for in said paragraph 1651 under the general provision for "all other materials or products that are found naturally in coal tar."

Plaintiff makes several claims. Free entry, either as bitumen under paragraph 1710 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1710), or as paraffin, directly under paragraph 1733 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1733), or by similitude under paragraph 1559 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1559), but subject to an internal revenue tax of 1¼ cents per pound under section 3422 of the Internal Revenue Code (26 U. S. C. § 3422), as amended by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, are argued for most vigorously. Classification is also urged as synthetic rubber, dutiable at 10 per centum ad valorem, either directly under paragraph 1558 of the Tariff Act of 1930, as amended by T. D. 51802, *supra*, or by similitude under paragraph 1559, *supra*, and an alternative claim is made for classification as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1558), dutiable at 20 per centum ad valorem. Although the protest also alleges that the merchandise is entitled to free entry under paragraph 1796 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1796), as wax, not specially provided for, that claim has been abandoned.

The record consists of most interesting and highly technical testimony from 15 witnesses—4 on behalf of plaintiff and 11 for defendant—and documentary exhibits, as well as samples of the merchandise in question. Phases of the proof, we deem important, will be referred to as discussion of the various issues proceeds.

S-Polymer, the subject of the present controversy, is prepared from styrene and isobutylene, mixed together and co-polymerized (chemically reacted) at a low temperature in the presence of a catalyst, resulting in long chain molecules and ending in a reactor in solution. The solution is mixed in hot water, vaporizing all materials not reacted and leaving the co-polymer dispensed as a slurry (watery or semifluid mixture) in hot water. The slurry is filtered to remove most of the water, leaving the crumb (indicative of the crumbled condition) which is dried. During the process of drying, particles tend to fuse together so the crumb is run through a cutting machine to produce the imported merchandise (plaintiff's exhibit 1 and 2), consisting of 60 per centum styrene and 40 per centum isobutylene, recognized as S–60, to distinguish it from substantially the same co-polymer known as S–50 (defendant's illustrative exhibits A and B), produced in pellet form

(small cubes) and containing an equal quantity of the two raw materials, styrene and isobutylene.

The foregoing description of S-Polymer is substantially as was given by plaintiff's witness, Stanley Edward Jaros, a chemical engineer in the employ of the Standard Oil Development Co. (an affiliate of the Standard Oil Co. of New Jersey), who began research on S-Polymer in 1943. In 1946, when it was learned that plant facilities were available at the Polymer Corporation in Sarnia, Ontario, Canada, the place of exportation of the present merchandise, the witness, assuming full responsibility for the undertaking, changed existing equipment and installed new, permitting production at the said plant which began operations in 1947, approximately 1 year before the shipment under consideration was exported.

The major question here is whether or not S-Polymer is synthetic phenolic resin or a resin-like product of a class or a kind contemplated by paragraph 28, *supra*.

Plaintiff's proof in this connection includes the testimony of Dr. Herman F. Marks, an eminently qualified chemist, whose experience includes several years of study and research with polymers, natural and synthetic, concerning their preparation, structures, and properties, and also with resins or resin-like substances prepared from phenol, cresol, phthalic anhydride, coumarone, or indene, particularly on projects dealing with the reactions of phenol with formaldehyde, cresol with formaldehyde, and urea with formaldehyde. At present, and since 1940, he is professor of organic chemistry at Polytechnic Institute in Brooklyn, N. Y., and also chairman of the Polymer Research Institute, a part of the chemistry department in Polytechnic Institute, devoted to the teaching of research into high polymers. His association with S-Polymer began about "four or five years ago" when he received samples from which determinations were made of molecular weight, solubility, X-ray diffraction, and the mechanical properties of the commodity. We give considerable weight to his testimony.

Asked to explain how he determines whether a material is a resin or resin-like product, the witness answered this way:

I would like to say perhaps the words resin and plastics have been used—and still are being used to some extent—interchangeably. I don't think that should be. There are definite and clear distinctions. And I would like to enumerate them in such a manner to say that a typical resin is an organic substance of low-molecular weight, say, between 500 and 1500—referring to hydrogen as 1, or oxygen—that is as far as the molecular weight is concerned—as far as the shape or configuration is concerned, it is usually irregular. They are not regular chains, but they contain links and side chains—phenol resin, coumarone resin, wood resin, or carnauba resins.

As a consequence of these structural factors, resins are, at room temperature, brittle, pliable, usually show what is referred to as conchoidal fractures. If you

hit a piece of resin with a hammer, it will disintegrate into many parts. Upon heating, they will soften; upon re-cooling, they solidify again—they do not crystallize. They solidify back again into a glassy material, brittle as before. They cannot be extended reversibly. They do not show high elongations.

Distinguishing characteristics of plastics are the high molecular weight, "30,000 to 100,000 or more." They can be extruded or deformed to assume a different shape permanently. So-called rubber plastics reveal elasticity or reversibility. When reduced to a soft state, they can be stretched and then returned to their original shape.

Referring specifically to S-Polymer, and based upon the distinctions hereinabove outlined, the witness testified, "I would not call that a typical resin, but rather a plastic." First of all, its molecular features, both in weight and structurally, are characteristic of a plastic. Then, too, S-Polymer, if expanded in film, can be stretched several hundred percent, and returned to its original condition. The witness concluded that the properties of S-Polymer are "quite characteristic for plastics, rubbers, rubbery plastics," but "not observed with typical resins."

S-Polymer is susceptible of a variety of uses. To show this phase of the imported product, we draw from the testimony of plaintiff's witness, Raymond G. Newberg, a chemical engineer employed by the Standard Oil Development Co. as a group leader in charge of research on plastic synthetic rubbers. He began initial production work on S-Polymer in 1944, and, having followed its development from earliest stages to final release as a commercial product, has become familiar with its physical characteristics and chemical properties. Used in electrical insulation, S-Polymer is employed in the manufacture of lead-in wire for television (plaintiff's exhibit 3), and provides nonconductive coating for the wire. In such usage, the product is extruded as a heavy layer on the wire. As a blend with wax, S-Polymer is used in small concentrations to improve flexibility and in some cases water-vapor permeability. The quality of asphalt for paper lamination is improved when blended with S-Polymer, which gives asphalt a higher melting point, increased ductibility, and general flexibility. Other uses for S-Polymer are as an adhesive in the assembly of shoes, for waterproofing canvas, and in paper coating where it "provides a water barrier." All of the uses, just enumerated, reflect the rubber-like qualities of S-Polymer, acquired through the polymerization of styrene and isobutylene which are the same as the materials used in producing synthetic rubber.

His reasons for saying that S-Polymer is not a resin-like substance are: "S-Polymer has a high molecular weight material. Upon heating, it will soften, and upon continued heating the structure does not change—it may be formed by thermol means, by that I mean it may be moulded, or calendered into sheeting and may be

extruded. As you increase the molecular weight of S-Polymer, it becomes more flexible and less brittle."

Plaintiff's proof, as just outlined, makes clear the peculiar properties that distinguish S-Polymer from resin-like material.

Defendant's evidence, on the other hand, discloses the nature of S-Polymer from a commercial standpoint, and is sufficiently important to set forth at some length.

Leonard C. Chamberlain, Jr., a chemical engineer employed by the Dow Chemical Co. as director of the laboratory, and with more than 20 years' experience in research work dealing with polymeric and plastic problems, which included cooperation with service and sales departments in the manufacture and evaluation of products to the point of turning them over for commercial distribution, stated that tests of the S-Polymer under consideration "convinced us that this material is a thermoplastic Polymer of 50,000 molecular weight or more," which would be "sold by our company to the moulding and extrusion trade as a plastic, and to the coating trade as a synthetic resin. We would use the terms as alternatives." Distinguishing between a resin and a plastic, based on "the authority of usages and users," the witness testified that "if the Polymer is fabricated as such into a finished article, it is a plastic and in the plastic trade moulding machines turn them out—pressure moulding machines. If a—if a material is sold to somebody as a compound to be used in a mixture where it loses its individuality and then it is used, such as for floor tiles or roofing material, that in general is the coatage trade, and in that trade you would call it a resin." This distinction is followed in commercial practice and is not incompatible with accepted definitions by polymer chemists. The statement that S-Polymer "would find markets in the synthetic resin trade" is conjecture, and is not accepted by us as all-conclusive, concerning the character of the merchandise.

Morris Omansky, a consulting chemist and rubber technologist, associated with the rubber industry for 39 years and whose work embraced processing different rubbers and manufacturing compounding ingredients, tested the product in question by putting it on a small rubber mill, similar to a wringer with metal rollers running parallel and that can be adjusted to temperature. Applying S-Polymer thereto at cool temperature resulted in a "coarse flaky material." Increasing the temperature and heating the rolls to 200 degrees Fahrenheit caused the S-Polymer to change in consistency and adhere to the rolls, finally coming off as a translucent film of "resinous horny structure," producing a "stony ring," unlike the reaction characteristic of natural or synthetic rubber. The substance lacked the extensibility or elastic recovery of fabricated rubbers, its tendency in such respect being comparable to that of leather, somewhat slow and rather incomplete.

lts degree of hardness varied according to temperature applied; higher temperature created softer material. This witness concluded that S-Polymer resembled certain classes of resins with which he worked and used on an industrial scale.

An advertising circular (defendant's collective exhibit 13–A), issued by the plaintiff corporation, describes S–50 polymer and S–60 polymer as "Colorless, soft and elastic to resinous polymers." Under the caption, "Processibility," the paper reads, "The polymers can be molded, calendered, extruded, and cast from solution. Blends with other resins and oils can be readily made by milling or kneading mixtures at elevated temperatures."

A publication, titled "A New Type of Thermoplastic Resinous Polymer," (defendant's collective exhibit 13–B), also released by the plaintiff corporation, categorizes the merchandise in question as follows: "The S-Polymers have a unique position in the realm of thermoplastics and resins since they can be used alone as a plastic or combined with other plastics as an alloying or modifying agent. They have plastic properties, yet exhibit rubber-like characteristics such as extensibility and recovery. They can be combined with Hevea and synthetic rubbers to improve processibility, increase water vapor and gas barrier properties and modify other physical properties. They can be used as wax blending agents, combining readily in hot melts."

While the record as a whole shows the S-Polymer in question to possess properties within the range of resin-like products in the field of certain plastics, and consequently susceptible of usage along the lines thereof, the significant aspect of the product is its faculty of elongation and reversible recovery. The ability to react in such manner is characteristic of linear polymers—of which S-Polymer is one—and is directly attributable to their "single dimension or rope-like" molecular structure, having wide temperature range through which it exhibits the stretching and retraction or recovery associated with rubber. This phenomenon in the present merchandise is assignable to the particular process followed in co-polymerizing styrene and isobutylene to form the finished product and bringing it within the class of products of comparatively recent development, recognized as rubber plastics and available to industry for several purposes as hereinabove noted. S-Polymer is such a plastic and is not classifiable under any of the categories provided for in paragraph 28, *supra.* Accordingly, the collector's action is overruled.

In view of this finding, we should point out that *Kuttroff, Pickhardt & Co., Inc.* v. *United States,* 21 C. C. P. A. (Customs) 332, T. D. 46864, relied on so strongly by defendant and discussed at great length in counsel's brief, becomes distinguishable. There, the product, an automobile body paint, was unquestionably a mixture, the sole issue

being whether one of its components, admittedly a synthetic resin, was prepared or derived from phenol, as contemplated by paragraph 28, *supra*. Here, the discussion concerns the general tariff provision for resin-like products in the same paragraph, which does not include the S-Polymer in question.

Consideration, now, turns to each of the several claims advanced by plaintiff. The principal one, and that toward which much of the proof is directed, is the claim for classification as synthetic rubber, either directly under paragraph 1558, as amended, *supra*, or by similitude under paragraph 1559, *supra*. In this connection, the record is sufficient to say that certain characteristics of S-Polymer in question—particularly tensile strength, specific gravity, solubility, molecular weight, elongation, water impermeability—are also found in synthetic rubber. These likenesses, however, are merely superficial, applying only within certain narrow regions of both products, and not substantially effective to establish classification as synthetic rubber.

Rubber consultants and technologists, all experts in the rubber industry, introduced by defendant, have convincingly established the soundness of that conclusion as shown by the following summation of their testimony.

Vitally essential to all rubbers are vulcanization and elasticity. Emphasizing the importance of vulcanization, the witness, Omansky (hereinabove referred to), stated: "It is the most important factor in the rubber industry. Without vulcanization, the rubber industry, as we have it today, could not exist. The products which we enjoy today, tires and tubes, nursing nipples, hot water bottles, and other drug sundries, could not exist." Vulcanization not only permits the stretching of rubber but also imparts to the substance the property of elasticity which reverses the substance to its original condition with much facility, i. e., within a fraction of a second.

Another of defendant's witnesses, Arthur M. Neal, assistant director of the rubber laboratory of E. I. DuPont de Nemours Company, speaking of vulcanization, testified that "the qualities of rubber which make it useful as an article of commerce—as a commodity in the modern day—have properties which are inherited in vulcanized rubber. It would be my statement that better than 95 per cent—and probably closer to 99 per cent—of all rubber in this country is as a vulcanized material." Vulcanization produces a product that is harder, more elastic, less thermoplastic, and having a "greater amount of bounce, a greater amount of abrasion resistance, also a greater amount of solvent resistance."

Neither vulcanization nor elasticity, which are virtually indispensable characteristics of natural and synthetic rubber, are possessed by S-Polymer. While the present merchandise has some degree of extensibility, its recovery is poor, both in timeliness and in fullness. Use of

S-Polymer as a compounding ingredient with rubber would impair the physical and chemical properties of rubber when vulcanized. These conditions reveal substantial dissimilarity in quality, material, texture, and use between synthetic rubber and the S-Polymer under consideration. Plaintiff's claims for classification as synthetic rubber are overruled.

Equally untenable is the claim that the merchandise in question is paraffin, either directly or by similitude. Plaintiff's line of argument in this direction is comparable to that presented in urging classification as synthetic rubber; namely, that S-Polymer and paraffin have some characteristics in common. This dictionary definition of paraffin, set forth in Webster's New International Dictionary, Second Edition (1937), contradicts that contention.

1. a   A waxy substance produced in distilling wood, shale, coal, etc., and occurring also in the earth as a constituent of petroleum or as a solid deposit; paraffin wax; solid paraffin. Pure paraffin is colorless or white, tasteless and odorless. Chemically, it is inert, being unaffected by most strong reagents. It is a complex mixture of hydrocarbons, chiefly of the methane series. According to composition, it melts at from 32° to 80° C. (89.6° to 176° F.) and has a sp. gr. of 0.79 to 0.94. It is used for making candles, waterproofing paper, impregnating matches, preserving food, etc., and for various scientific purposes. b   By extension, any of a wider range of such mixtures, including some that are oily liquids or semisolids; as, solid *paraffin*. See Petrolatum.

Counsel for plaintiff, in their brief, have quoted the foregoing definition and argue therefrom that there is similarity in quality, material, texture, and use between S-Polymer and paraffin. The record does not support the allegations. On the contrary, uncontradicted testimony offered by defendant shows that certain characteristics, inherent with paraffin or wax, cannot be attributed to the product in question. Wax or paraffin will melt on the application of heat to a thin liquid which on cooling reverts to its original condition. The present merchandise is not capable of such reactions. Unlike S-Polymer, wax or paraffin has no extensibility.

Suggesting a similarity in use between S-Polymer and paraffin, plaintiff's counsel argue that "the evidence is uncontradicted and is therefore conclusive, that S-Polymer is used in place of paraffin in paper coating; and that such use is the same mode and kind of use producing the same result in substantially the same way so as to take the place of the other." There is no factual basis to support the statement just quoted. Plaintiff's witness, Newberg, testified on cross-examination that S-Polymer is used as a modifier in blending paraffin or wax "to increase its flexibility, and to raise its melting. And it also improves its processibility upon the application to paper." That testimony does not say, and cannot be construed as saying, that S-Polymer is paraffin, either directly or by similitude.

*United States* v. *Buffalo Natural Gas Fuel Co.*, 172 U. S. 339, is cited to support the claim for classification as bitumen under paragraph 1710, *supra.* That case arose under the Tariff Act of 1890 and concerned classification of natural gas, piped from Canada under the Niagara River, and entered at the port of Buffalo, for use in this country as fuel and for illuminating purposes. The collector classified the commodity as a nonenumerated unmanufactured article, assessing duty at 10 per centum. The defendant gas company claimed free entry either as a crude mineral or as crude bitumen. The Court held that either of the claimed classifications was more specific than the one invoked by the collector and, accordingly, granted free entry to the merchandise, without conclusively deciding which provision was applicable because both were on the free list. The decision has no bearing on this controversy.

Relying on the common meaning of the word bitumen, counsel for plaintiff set forth three definitions of the word. To quote those definitions would unduly lengthen this opinion. Counsel has drawn from each certain words and argues that "a product is a bitumen if it is an inflammable hydrocarbon soluble in carbon disulphide." Plaintiff attempts to tie in that constructed description with the present merchandise by referring to testimony of the witness, Newberg, stating that S-Polymer is an inflammable hydrocarbon, soluble in carbon disulphide, and then arguing that the product in question "falls squarely within the common meaning of the term 'bitumen'." The characterization developed by plaintiff cannot be accepted as sufficient to hold that S-Polymer meets the common or ordinary definition of "bitumen." Claim for classification as such is overruled.

There is no dispute between the parties that S-Polymer is a manufactured article, and not being specially provided for, it follows that paragraph 1558, *supra,* becomes applicable. Accordingly, we hold the product to be classifiable under said paragraph as a nonenumerated manufactured article, dutiable at 20 per centum ad valorem, as claimed.

The protest is sustained and judgment will be rendered accordingly.